UNITED STATES of America,
Appellee,

v.

Richard S. KNIGHT, Defendant-Appellant.

No. 316, Docket 31784.

United States Court of Appeals
Second Circuit.

Argued Feb. 7, 1968.

Decided May 9, 1968.

Richard S. Knight, pro se.*

Lee A. Albert, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Pierre N. Leval, Asst. U. S. Atty., on the brief), for appellee.

Before LUMBARD,** Chief Judge, and WATERMAN and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Richard S. Knight appeals from a judgment of conviction in the United States District Court for the Southern District of New York, Thomas F. Croake, J., for interstate transportation of obscene materials for the purpose of sale and distribution, 18 U.S.C. § 1465. For the reasons given below, we affirm the conviction.

Taking the evidence in a light most favorable to the Government, as we must after a judgment of conviction, the relevant facts are as follows: On October 7, 1965, Detective Newmark and two other New York City detectives observed appellant and his wife [1] walking on the street in the vicinity of Riverside Drive and 80th Street in Manhattan. Several times the couple stopped and looked about; finally, they entered a parked automobile. The detectives approached and asked appellant for his license and registration. Appellant produced a driver's license and a rental agreement for the automobile which showed that it had been rented from a Beverly Hills, California rental company. This agreement indicated that the car was "Due In" on September 26, 1965, and that under California law any person who failed to return a vehicle within five days after it was due was presumed to have embezzled it. When asked about this, appellant replied that the rental company knew he had the car in New York. To verify this, Detective Newmark asked appellant to accompany him to the police station; appellant, however, suggested that the detectives accompany him to his apartment, located one block away, to make a call to California. After first refusing, Newmark finally agreed to go with appellant to his apartment for this purpose. When the group arrived there, Newmark observed that there was a projector and screen set up, with film in the projector. Newmark spoke to the rental company in California, and a spokesman there said that he was not aware of the car's presence in New York.

Thereafter, Newmark asked appellant what kind of films were on the projector. Appellant answered that they were "dirty," "As dirty as they can be." Newmark asked if he could see the films; appellant complied and exhibited two allegedly obscene films. Newmark, although he considered the films obscene, did not put the defendant under arrest because he "was looking for further evidence." At that point, one of the other detectives showed Newmark some polaroid photographs which he had found lying face-up on a bureau in the room. Newmark asked appellant where he had obtained the photographs and the film. Appellant replied, "I didn't get them here. I brought them from California with me." Newmark told him that it was illegal to have such films and photographs in New York; appellant reiterated that he had brought them from Cali-

---

* While the case was on appeal, appellant discharged his trial attorney and prosecuted the appeal himself.

** Judge Bartels of the Eastern District of New York, who was sitting by designation, heard argument in this case but disqualified himself thereafter. Pursuant to Rule 4(c) of the rules of this court, Chief Judge Lumbard was substituted as a member of the panel and has participated in the determination of the appeal on the record and briefs.

1. There is a dispute whether appellant's companion was his wife. During the trial she testified that she was, but to impeach her credibility the Government confronted her with her grand jury testimony in which she denied ever having been married. For purposes of convenience, we will refer to her as Mrs. Knight in this opinion, as the trial judge did in his memorandum opinion.

fornia. At that point Newmark asked him, "Where is the gun?" Appellant responded by producing a loaded automatic from under the projector. Newmark then placed appellant under arrest for grand larceny, violation of the city gun law, and possession of pornography.[2] In a subsequent search of the room, other allegedly pornographic photographs were found.

Although it is unclear from the record which detective made the call, the FBI was called, and Agent McShane and another agent arrived. McShane asked that appellant's handcuffs, placed on him by city detectives, be removed. McShane advised Knight of his constitutional rights, and appellant said that he understood what McShane was talking about; appellant then told McShane that he had transported all the photographs and films with him from California. No federal charges were lodged against Knight at that time. On October 25, 1965, appellant was arrested and taken to FBI headquarters, at which time he maintained that he had purchased all the material, except the polaroids, in New York City.

Appellant was indicted on one count of violation of 18 U.S.C. § 1465 [3] on October 28, 1965. At trial before Judge Croake, sitting without a jury, the above was the bulk of the Government's case.[4] The

only defense witness was Mrs. Knight, who testified that all the pictures but the polaroids were purchased in New York, that the polaroids were taken in New York, and that the appellant did not intend to sell them, but used them to solve a sexual problem. Judge Croake found the materials were clearly obscene, a finding with which this court agrees as to a good portion of the material,[5] and that the appellant had admitted, after proper warnings, that he had transported the materials from California to New York. The judge rejected the defense contention that the presumption of intent to distribute had been rebutted by Mrs. Knight's testimony.

The most difficult issue raised on appeal is the admissibility of the oral statement made by appellant to Agent McShane, which the trial judge used to establish interstate transportation. Appellant claims that under Westover v. United States, a companion case to Miranda v. State of Arizona, 384 U.S. 436, 494–497, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), his statement to Agent McShane should have been excluded from evidence even though McShane admittedly gave him adequate warnings before interrogating him; appellant's theory is that the earlier failure of the city detectives to warn him properly of his constitutional rights tainted the later statement to McShane.

---

2. At the hearing on a motion to suppress held prior to trial, Detectives Newmark and Stegman, another of the city detectives, testified that appellant was placed under arrest just after he said the films came from California. For our purposes, it does not matter which time is accepted.

3. The statute provides in pertinent part:
Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

The transportation as aforesaid of two or more copies of any publication or two or more of any article of the character described above, or a combined total of five such publications and articles, shall create a presumption that such publications or articles are intended for sale or distribution, but such presumption shall be rebuttable.

4. A motel manager also testified for the Government to establish that some of the photographs had been taken in California.

5. It may be, as appellant contends, that some of the materials are not obscene. However, enough are clearly obscene to more than satisfy the statutory presumption discussed below.

In *Westover*, the defendant had been arrested by local police; he was in custody for fourteen hours, during which period he was interrogated before he was turned over to the FBI. The FBI immediately continued the interrogation concerning a different crime, after giving Westover the proper warnings; the defendant, after two and one-half hours more, confessed to the commission of two bank robberies. The Supreme Court reversed a conviction based on the confessions, stating (384 U.S. at 495, 86 S.Ct. at 1639):

> On the facts of this case we cannot find that Westover knowingly and intelligently waived his right to remain silent and his right to consult with counsel prior to the time he made the statement. [Footnote omitted.]

The Court pointed out that the impact on the defendant was that of a continuous period of interrogation, and that for him the warnings came, in effect, at the end of the interrogation period rather than at the beginning. But the Supreme Court did not say that all interrogations by federal authorities would be tainted by the prior failure of local authorities to give the proper warnings (384 U.S. at 496–497, 86 S.Ct. at 1639):

> We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege.

■ It appears, then, that in this situation a court must decide the question of admissibility *ad hoc*, based on the particular facts of each case. It has been pointed out that whether a confession to federal authorities, after a proper warning by them, is admissible depends upon the "causal relationship" between the earlier unconstitutional interrogation by the local police and the later incriminating statements. See Evans v. United States, 375 F.2d 355, 361 (8th Cir. 1967). The ultimate issue is whether "the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation." *Westover*, 384 U.S. at 497, 86 S.Ct. at 1639.

■■ With this inquiry in mind, we turn to analysis of this case. It may well be that even the statement made by appellant to Detective Newmark prior to the arrival of the FBI agents is admissible under the *Miranda* rules as on-the-scene questioning, see United States v. Littlejohn, 260 F.Supp. 278 (E.D.N.Y. 1966), or as volunteered, see Cotton v. United States, 371 F.2d 385, 393 (9th Cir. 1967). However, we need not decide that question; assuming *arguendo* that the earlier statement was inadmissible, all we need resolve is whether the confession to Agent McShane was also inadmissible because of any taint carried over from the actions of the city detectives.[6] Here we have a short interroga-

---

6. Appellant apparently argues that all the testimony of Detective Newmark was improperly admitted by the trial judge. However, all elements of the crime were established by Agent McShane's testimony. The only admission made to Newmark was that the films came from California. The trial judge sat without a jury and relied on appellant's statement to Agent McShane, not to Detective Newmark, to establish interstate transportation. Under these circumstances, whatever might be the case in a jury trial, we will not reverse. See United States v. Tutino, 269 F.2d 488, 491 (2d Cir. 1959); cf. Ferguson v. Post, 243 F.2d 144 (2d Cir. 1957).

tion—if asking a few questions of appellant in the context of the facts here was an interrogation—in appellant's own home, to which he had invited the local police. Certainly the fact that a suspect is at home bears on whether pressure was applied upon him. See United States v. Gleason, 265 F.Supp. 880 (S.D. N.Y.1967); United States v. Knight, 261 F.Supp. 843 (E.D.Pa.1966); People v. P., 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967). The period during which the local police questioned appellant, although not established with precision in the record, was evidently not long —in any event, much shorter than the fourteen hours involved in *Westover*. The major element of the crime—possession, which creates the presumption of intent to sell—was established by appellant's voluntary act of showing the films, the photographs in plain sight, and the lawful search of the premises incident to the arrest by city police. It is true that appellant had "let the cat out of the bag,", see United States v. Bayer, 331 U.S. 532, 540, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), by telling the local officers that he had brought the pictures from California. However, no psychological disadvantage flowed from that because appellant apparently thought that the fact that he did not obtain the material in New York protected him. Moreover, that the admission was once made should not, in itself, always be fatal, see United States v. Bayer, supra; surely, federal authorities must sometimes be allowed to conduct reasonable investigations even when state authorities have failed properly to apprise suspects of their constitutional rights. In view of the lack of coercive atmosphere, accented by the request by the FBI that appellant's handcuffs be removed, we feel that the "totality of circumstances" indicates there was no "causal relationship" between any unconstitutional behavior by local authorities and appellant's confession to the FBI, Evans v. United States, 375 F.2d at 361. In these circumstances, the "compelling pressures" which concerned the Supreme Court in *Miranda* were absent. 384 U.S. at 467, 86 S.Ct. 1602. See also Hoffa v. United States, 385 U.S. 293, 304, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Therefore, unlike the situation in *Westover*, the careful giving of the warnings alone was "sufficient to protect the [constitutional] privilege." 384 U.S. at 497, 86 S.Ct. 1602. See also United States v. Gorman, 355 F.2d 151, 157 (2d Cir. 1965), cert. denied, 384 U.S. 1024, 86 S.Ct. 1962, 16 L. Ed.2d 1027 (1966); cf. Bell v. United States, 382 F.2d 985 (9th Cir. 1967).

■ Appellant also claims that the presumption of intent to sell from the possession of a certain amount of obscene material[7] was conclusively rebutted as a matter of law by Mrs. Knight's uncontradicted testimony that the material was used for the private purposes of appellant and his wife. However, Mrs. Knight's testimony did not require a judgment of acquittal since the weight of her testimony depended upon her credibility, which the trial judge obviously found wanting. Moreover, Judge Croake did not have to rely on the presumption alone. In addition to the numbers and sets of pictures, there was also other evidence to support the judge's finding that appellant had the requisite intent, such as the testimony of Agent McShane that appellant said he was a professional photographer and the presence of photographic equipment in the room. In short, we conclude that while it is possible that all of the material was transported for appellant's private purposes, we do not feel justified in setting aside the verdict of the trier of fact.

None of appellant's other arguments require discussion. It should be noted that appellant conceded at oral argument that the officers had the right to ask for his driver's license and automobile registration.

Judgment affirmed.

LUMBARD, Chief Judge (concurring):

While I concur in Judge Feinberg's opinion, I think it should be pointed out

---

7. See note 3, supra.

that the statements made by Knight to the city detectives in his apartment after they had gone there with him at his invitation were admissible in evidence against him. These statements were made under circumstances free from coercion, while Knight was in his own home in the presence of the woman companion who had travelled with him from California. None of the aspects of in-custody interrogation which led the Supreme Court to outlaw the use of statements made by suspects who had not been given certain warnings and therefore might not have chosen to speak willingly, are present here. Miranda v. State of Arizona, 384 U.S. 436, 465, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

While Knight was arrested shortly after these statements were made, they were made at a time when Knight evidently believed he was only under suspicion with regard to the car he had driven from California. There was no occasion whatever to require warnings set forth in Miranda v. State of Arizona, with respect to the statements made to the police. See 384 U.S. at 456–458, 478 n. 46, 86 S.Ct. 1602.